HACK, RECEIVER *v.* CHRISTINA ET AL.

[No. 26,934. Filed November 24, 1937. Rehearing denied December 17, 1937.]

*Joseph Collier* and *Chalmer Schlosser,* for appellant.

*Robert K. Eby, Fred C. Gause* and *Floyd J. Mattice,* for appellees.

TREANOR, C. J.—This is an equitable proceeding to

establish a trust in certain mortgage securities which had been separated from the general assets of the Washington Bank and Trust Company, and which, as stated on the individual mortgage record sheets, had been *pledged to secure* First Lien Savings Certificates.

In an action by the State of Indiana, on the relation of its Bank Commissioner, against the Washington Bank and Trust Company, the Circuit Court of Marion County adjudged the bank insolvent, and appointed a receiver to liquidate the assets and adjust the affairs of the bank. Appellant, Oren S. Hack, is the qualified receiver of the bank.

By leave of court Theodore W. Christina filed an amended intervening petition against the receiver of the bank in behalf of himself and all other persons, firms, partnerships, etc., similarly situated, in which he alleged in substance that the Washington Bank and Trust Company of Indianapolis, Indiana, was a corporation organized and doing business under the laws of the State of Indiana relating to bank and trust companies; that about the year 1926 the Washington Bank and Trust Company organized and established a Trust and Savings Department, separate and distinct from the other departments of said company, for the purpose of selling and issuing First Lien 6% Real Estate Certificates which were to be secured by mortgage notes and first mortgage liens, and that all mortgage liens and notes and the proceeds thereof as and when collected would be used solely to pay said First Lien 6% Real Estate Certificates sold and issued by said company.

During the year 1928 the Washington Bank and Trust Company changed the original plan and a Blue Pass Book was used which contained the printed form of the original certificates, which book was to be held by each person, firm, partnership, etc., buying First

Lien 6% Real Estate Certificates. The purpose of the combination of Certificate and Blue Pass Book was to afford a convenient method of buying a First Lien 6% Real Estate Certificate by small partial payments, designated as deposits.

Appellee, Christina, further alleged in his intervening petition that upon accepting payments from purchasers of the First Lien 6% Real Estate Certificates the Washington Bank and Trust Company kept separate ledger books for such deposits, and that certain books, records and mortgages were stamped with a rubber stamp with the words "Mortgage to secure payment of First Lien Savings Certificates"; that as purchases were made, the amount was entered on the records of said department and upon the pass books held by the investors.

Appellee, Christina, claimed that he and all other holders of First Lien 6% Real Estate Certificates, or Blue Pass Books, were entitled to be paid the total sum of payments into this department plus interest at the rate of 6% per annum, less a 9% dividend which had been paid by a prior Receiver of the Washington Bank and Trust Company.

The court below found the facts specially and stated conclusions of law thereon that appellee, Theodore W. Christina, and all depositors holding deposits in the Blue Pass Books issued by the bank, had a lien on and were entitled to priority of payment over all other creditors of the bank from the fund accruing by reason of liquidation of certain mortgage securities held by the bank at the time it closed. The court entered judgment accordingly and ordered appellant, as receiver, to pay in full from funds accrued from liquidation of such securities, the claim of Theodore W. Christina and all other depositors holding Blue Pass Books issued by the bank.

For the purpose of supplying the basis of our discus-

sion we set forth the following excerpts from the finding of facts:

"5. That said Trust Company maintained together with its general banking department a Trust Department, a Bond Department, a Real Estate Department, an Insurance Department, and in connection with its general banking business a Savings Department, and that in this Savings Department which was supervised and administered by employees of said Trust Company after January, 1927, there existed two separate departments of said Savings Department, one known as the Savings account and the other as the Blue Pass Book account, and although the same employees received and accepted deposits in each of said departments those deposits which were deposited in the Blue Pass Book Department were kept by way of record upon paper which was blue in color and different in respect to color from the general Savings Department deposits, and that pass books which were blue in color were issued to each depositor who had deposited his money in the Blue Pass Book Department of said Savings Department of said Trust Company.

"6. That a separate ledger was kept by said Trust Company in which the names of the people making deposits in the Savings Certificate Department were kept and in this same ledger the amount of their deposit was also noted and a box or vault was indicated for the keeping of these records separate and apart from the other department. That from time to time the general banking department either through agents or officers took possession of and took over the money which had been deposited by the holders of BLUE PASS BOOKS and the same was commingled with the general monies of the banking department of the Trust Company but when this occurred entries were made in the books and this separate ledger heretofore referred to debited the department of the bank in such amount of money which had been taken possession of by the general banking department through its agents or officers.

"7. The Trust Company loaned from the general fund of the banking department money on notes secured by first mortgage on real estate and

other collateral and that a record of such loans was kept in the mortgage ledger and that when the FIRST LIEN 6% REAL ESTATE SAVINGS CERTIFICATES and the BLUE PASS BOOKS were issued and deposits received thereon the Trust Company selected through its officers and agents from these mortgage real estate loans certain notes and mortgages approximately equal in face value to the amount paid in on the CERTIFICATES AND BLUE PASS BOOKS and on the mortgage ledger heretofore referred to marked on said ledger the following 'Transferred to Secure First Lien Savings Certificate' and indicated the date of the transfer. The record kept by the Trust Company for each of such mortgages carried the following language stamped upon it 'This Mortgage Pledged to Secure First Lien Savings Certificates.' That from time to time as the deposits increased in the SAVINGS CERTIFICATE Department additional mortgage loans which had been made by the bank were selected from the general bank assets and the record ledger of the Trust Company was stamped in the manner as set out aforesaid. That the face value of these securities designated in the manner as indicated on the books of the Trust Company at the time it closed was $473,421.74 and that the total aggregate amount of the CERTIFICATES or BLUE PASS BOOKS deposits which appeared upon the records of the Trust Company as having been paid in by such depositors was the sum of $647,751.78.

\* \* \*

"9. . . . That subsequent to March 3, 1926. and prior to the closing of the trust company the 'Savings Certificate Department' accepted moneys from more than 700 different people and issued to them what were termed 'Blue Pass Books' which contained the following language:

"WASHINGTON BANK AND TRUST
COMPANY OF INDIANAPOLIS

First Lien 6% Real Estate Savings
Certificate Department

1. This Company issues First Lien Real Estate Savings Certificates on the basis of 6% per annum, payable January first and July first, subject

to provisions, conditions and regulations set out in the back hereof and in said certificates.

2. These certificates are specifically secured by first liens on real estate mortgages and/or the equivalent thereof and/or obligations of the United States of America, and/or any political subdivisions thereof and/or cash on hand or in banks, which items are set aside from the other assets of the Company for the protection of these certificates.

\*     \*     \*

4. Notice may be required by the Company as provided in the certificates before payment of such certificates. Such certificates are intended for funds on which a permanent investment is desired, and are not intended for funds which the customer expects to use from time to time.

\*     \*     \*

## REGULATIONS AND CONDITIONS
### 1. Credits

Items credited herein are credited as a partial or total payment upon the purchase of a First Lien 6% Real Estate Savings Certificate of the Company and subject to the conditions thereof, copy of which certificate is as follows:

### WASHINGTON BANK AND TRUST COMPANY

#### Indianapolis, Indiana

Promises to pay to................................the principal sum of................................DOLLARS, with interest thereon beginning the first day of the month following the date hereof at the rate of six per cent (6%) per annum, payable each January first and July first, to the holder of this certificate, as shown on the books of Washington Bank and Trust Company, hereinafter referred to as Trust Company, said principal and interest being payable on a pro rata basis out of the funds actually paid to and collected by the Trust Company, on account of certain first liens secured by real estate mortgages and/or the equivalent thereof subject only to current taxes and assessments for municipal improvements, and/or obligations of the United States of America and/or any political subdivision thereof,

and/or cash on hand and in banks, which items are hereafter referred to as collaterals, in the principal amount in face value of not less than the principal amount of outstanding certificates likewise secured which collaterals are and shall continue to be set apart from the other assets of the Trust Company for the benefit of the holders of this certificate and other similar outstanding certificates.

The Trust Company shall have the right to renew or extend and to make substitutions for the collaterals originally deposited herein, to increase or decrease the amount of collaterals, to increase or decrease the amount of these certificates outstanding from time to time, to provide different interest rates on any such additional certificates so long as no certificates call for more than six per cent per annum payable semi-annually, to issue these certificates with provision set out in any such certificates for definite fixed periods before which such certificates may be cashed on notice under conditions hereinafter provided, provided always that the principal amount of these certificates outstanding at any one time shall not exceed the face value of the principal amount of collaterals pledged hereunder to secure the payment thereof.

Any holder wishing to cash this certificate shall give the Trust Company three months' written notice of such desire, when the holder of this certificate shall be entitled to receive in cash a sum equal to a pro rata share of the principal collaterals then securing this certificate and other such outstanding certificates not to exceed one hundred per cent of the principal amount hereof and accrued interest, provided that not more than hundred per cent of the cash collected by the Trust Company in any one calendar month out of the principal of said collaterals securing this series of certificates shall be applicable to the payment of the principal of this and/or other certificates secured likewise unless otherwise ordered by the Trust Company; and when such demands of holders of this and other certificates exceed the cash so collected on the collaterals securing said certificates, the cash so collected shall be applicable to the payment of this and such other certificates in the order in which such written notices are filed with the Trust Com-

pany. The Trust Company may in its discretion from time to time waive the notice of withdrawal herein required, but any such waiver shall not estop it from later requiring such notices at its discretion.

The Trust Company reserves the right to call this certificate on thirty days' written notice to the holder thereof as shown on the books of the company at par plus accrued interest.

This certificate is non-negotiable and is transferable only on the books of the Trust Company.

WASHINGTON BANK AND TRUST COMPANY.

By................................................President.

Attest:

................................................Secretary.

### 2. Interest

Interest will be credited on the books of the Company January 1 and July 1 but will not be payable or entered on the customer's book until on or after January 10 and July 10. It is not necessary to present the book for the entering of interest on any particular day.

\* \* \*

### 6. COUNTER CLAIMS

The Company reserves the right to deduct from any credit the amount of such counterclaims as it may have against the original owner of this book."

"10. The court further finds that the Washington Bank and Trust Company during the time it accepted moneys in its 'Savings Certificate Department' distributed to the public advertisements and literature. That said literature so distributed by said trust Company, among other things, contained the following statements:

### 'A NEW DEPARTMENT FOR SAVINGS

6%

'WASHINGTON - BANK AND TRUST COMPANY has established an investment department for savings. This department will be called the "Savings Certificate Department," and its business will be to receive and invest moneys for people who are seeking relatively permanent investment, i.e., moneys not likely to be wanted for other uses on short notice. These funds will differ in two impor-

tant particulars from deposits in other departments of the bank:

'First. They will provide a higher rate of interest than those of any other department. Interest will be paid each January 1 and July 1.

'Second. They may not always be withdrawable, either upon demand or within any specified number of days. They will be, in fact as well as in name, investment funds rather than bank deposits of the ordinary character.

'. . . This means, first, that this department will carry no cash reserve against these funds, excepting only any minimum required by law, and, second, that most of the funds will be tied up in slow loans most of the time, and that therefore customers of this department may at any time be required to give notice of their intention to withdraw.

'The loans, securities and moneys belonging to this department will be kept separate from all other assets of the bank, and customers of this department will be paid only out of these separate assets. Customers of this department will *not* (previous word in italics) be paid out of other funds of the bank. This rule will be rigidly enforced, no matter how much idle cash the bank may be carrying as reserve against deposits.

'The purpose of establishing this department is to provide a convenient and easily understood investment that will pay a relatively high rate of interest and at the same time be safe; that is, to relieve people who do not have time or inclination to study the intricacies of ordinary investments the trouble of doing so. . . .'

\*    \*    \*

"14. That in 1930 at the time the Trust Company closed its doors it held certain mortgage notes and mortgages on real estate payable to the Trust Company and that such notes and mortgages were entered on the mortgage ledger of the Trust Company and this mortgage ledger had the following memoranda stamped thereon 'Transferred to Secure First Lien Savings Certificate. Date...............' This memoranda was placed upon this mortgage ledger by the affixing of a rubber stamp which upon the closing of the Trust Company came into the possession of the Receiver and is now in the

possession of the Receiver. The actual and identical notes and mortgages did not contain this stamp. The record sheet kept by the Trust Company for each of such mortgages carried the following language stamped upon it 'This Mortgage Pledged to Secure First Lien Savings Certificate.' And that as the deposits increased in this department additional mortgage loans were selected from the bank's general assets and these records of the bank stamped as aforesaid. That the face value of the securities so designated only however, upon the books of the Trust Company as aforesaid and not on the actual mortgages or notes themselves at the time the Trust Company closed in 1930 was $473,-421.74, and that the amount of the CERTIFICATES or BLUE PASS BOOKS issued at that time was $647,751.78.

"15. All depositors in the BLUE PASS BOOK system issued by the Trust Company through its Savings Certificate Department bore a separate number together with the name of the party to whom it was issued and within said book there was credited the deposits and their dates made by the holder of the book and also the withdrawals together with the dates of same and also computation of interest twice each year, namely, the first of January and the first of July, and the bank's record of the contents of each of these books showing all of the above was indicated and contained on separate deposit ledger cards which were colored blue, which bore the name of the depositor which corresponded with the name and the number appearing upon the BLUE PASS BOOK issued to such depositor. At the time the Trust Company closed its doors and quit doing business there was in its possession these records heretofore mentioned designated as mortgage ledger of the Trust Company's bookkeeping system, the pages of which were stamped by a rubber stamp stating 'Transferred to Secure First Lien Savings Certificate' together with the date upon which the transfer was made, and that these mortgage loans heretofore stated in these findings aggregated $473,421.74, and that all of the same came into the hands of the Receiver of the Bank. That upon the debit side of this said mortgage ledger as aforesaid there was contained an item which read as follows: 'Other

Securities to Secure First Lien Savings Certificates.' The aggregate sum of these securities was $229,184.00, but the Court finds that no such other securities were present in the Bank's effects, were not found by the Receiver and have never since the closing of the Bank been in the possession of the Receiver. That there was an agreement contained specifically in the contract set forth in the FIRST LIEN SAVINGS CERTIFICATE and likewise in all of the literature which preceded the issuance of said CERTIFICATES by which the Trust Company did agree with the several depositors of the BLUE PASS BOOK system to secure them against loss by setting aside first lien real estate mortgages to secure the aggregate amount and sum of all BLUE PASS BOOK accounts issued. And there was an agreement by which the Trust Company agreed to secure the payment of the several sums deposited in the BLUE PASS BOOK system by collateralizing these BLUE BOOK accounts with these mortgages; and that the mortgage ledger books of account of the Trust Company did contain the memoranda hereinbefore set forth in these findings and that it was the intention of the Trust Company to secure the BLUE PASS BOOK accounts by the setting aside from its general assets of these first lien real estate mortgages, but the Court does not find that the identical money deposited by the BLUE PASS BOOK depositors was used to purchase or make these loans and receive in return therefor these first lien real estate mortgages as aforesaid, but that the same was done for the commingled general monies and assets of the Trust Company without specific or particular regard to the source of said money."

Under "Propositions, Points and Authorities" appellant states fifteen propositions which question the conclusions of law and the action of the trial court in overruling the motion for a new trial. Appellant suggests that there are duplications in several of the propositions due to the fact that the assigned errors in some instances present the same legal principles; and the substance of his contention on appeal may be stated as follows: (1) The legal consequence of the agreement

between the Washington Bank and Trust Company and Blue Pass Book holders was that the latter became general depositors of the former; (2) the facts as found disclose that the Washington Bank and Trust Company and the Blue Pass Book holders intended to and did make a contract whereby the bank secured payment of the deposits; (3) the bank did not have legal power to make a contract to secure payment of such deposits, by a pledge of its assets, and such agreement was void for the reason that it was a violation of public policy; (4) granting both that the agreement, and transactions thereunder, did result in the creation of a trust relation, and that the Washington Bank and Trust Company had the power to enter into such a relation and to create a trust res out of the mortgage securities, appellant urges that no funds of the Blue Pass Book claimants were traced into the mortgage securities in question for the reason that the deposits, or payments, of the Blue Pass Book claimants were commingled with the general funds of the bank and the mortgage securities in question were purchased out of the general funds of the bank.

It is true, as between general depositors, that the effect of a pledge to a depositor of a part of the assets of the bank is to withdraw, for the benefit of such depositor, a part of the funds to which all depositors look for protection. But if the separated assets become the only source of repayment to the depositor, and if the amount of his deposit is equivalent to the value of the assets which are separated from the general assets of the bank, and if, furthermore, the amount of the deposit passes into and becomes a part of the general funds of the bank, no injury in fact results to the interests of other depositors, or creditors, of the bank.

It was a part of the agreement between the Washington Bank and Trust Company and the Blue Pass

Book holders that *all items deposited* and credited in the Blue Pass Book constituted partial or total payments upon the purchase of a first lien 6% Real Estate Savings Certificate of the company, subject to conditions which were set out in the Pass Book and in the certificates. The certificates recited that "Washington Bank and Trust Company, Indianapolis, Indiana, promises to pay to.......................the principal sum of.......................... with interest thereon . . ." But the certificate also recites that such principal and interest are payable on a "pro rata basis out of the funds actually paid to and collected by the Trust Company, on account of certain first liens secured by real estate mortgages . . . which items are hereafter referred to as collaterals, in the principal amount, in face value, of not less than the principal amount of outstanding certificates likewise secured, which collaterals are and shall continue to be set apart from the other assets of the Trust Company for the benefit of the holders of this certificate and other similar outstanding certificates."

There are other conditions and provisions to the effect that the certificates "are specifically secured by first liens on real estate mortgages . . . which items are set aside from the other assets of the company for the protection of these certificates"; that "these certificates provide a permanent investment at a satisfactory rate of interest—the security for which in the opinion of the Company is of the highest type"; that "such certificates are intended for funds on which a permanent investment is desired, and are not intended for funds which the customer expects to use from time to time."

Statements in the advertising matter which was circulated by the Washington Bank and Trust Company emphasized the fact that the Blue Pass Book depositors were investors and not general depositors. According to the advertising literature "the purpose of establishing

this department is to provide a convenient and easily understood investment that will pay a relatively high rate of interest . . . to relieve people who do not have time or inclination to study the intricacies of ordinary investments the trouble of doing so." And the literature contained this further statement: "The loans, securities and moneys belonging to this department will be kept separate from all other assets of the bank, and customers of this department will be paid only out of these separate assets. Customers of this department will *not* be paid out of other funds of the bank."

The holder of a Blue Pass Book must have understood that his first lien 6% mortgage certificate made him a permanent investor in what was in substance an investment trust. He could not have become a general depositor in the Washington Bank and Trust Company because under the terms of his certificate and under the rules and regulations governing the Blue Pass Book Savings Department the Washington Bank and Trust Company was obligated only to manage the funds and repay to the investor the principal with interest at 6%, provided the certificate holder's pro rata interest in the proceeds, actually realized from the securities which constituted the investment res, would be sufficient to repay him the principal sum with interest at 6%.

We conclude from the foregoing that the intent of the Washington Bank and Trust Company and of the Blue Pass Book holders was that the Washington Bank and Trust Company, through its Savings Certificate Department, would hold in trust for, and manage for the benefit of, the Blue Pass Book holders the funds consisting of securities, chiefly mortgage securities, which securities would be paid for out of the moneys received from the Blue Pass Book holders. It was understood that these securities would be set apart from the other assets of the company and that the amount of such

securities would be equal to the amount of the deposits, or payments, of the Blue Pass Book holders. The facts as found by the trial court show that the Washington Bank and Trust Company did select mortgage securities from its general assets; and that the record sheet kept by the Trust Company for each of such mortgages carried the following: "This mortgage pledged to secure first lien certificate"; and also that the general mortgage ledger of the Trust Company contained entries, or memoranda, which designated what mortgage securities had been transferred from the general assets of the company, such entries or memoranda being as follows: "Transferred to secure first lien savings certificate, Date.........................."

In our opinion the effect of the agreement and of the subsequent acts of the Washington Bank and Trust Company was to separate from the general assets of the bank the mortgage securities in question in this suit, and to create a distinct and separate investment fund in which each Blue Pass Book holder had an undivided equitable interest. Furthermore, in our opinion the trial court was correct in holding that the Blue Pass Book holders had no claim upon the general assets of the bank and, consequently, could not be classed as general depositors. In short, the Blue Pass Book holders were equitable owners of the fund consisting of the mortgage securities, and were not general depositors whose deposits were guaranteed by a pledge of a part of the general assets of the bank.

It is true, as urged by appellant, that the facts found disclose that the deposits of the Blue Pass Book holders which were made in the Savings Certificate Department, were transferred to the general funds of the Washington Bank and Trust Company, and that the mortgage securities which were transferred to the investment fund were taken out of the mortgage securi-

ties which had been obtained by loans out of the general funds of the bank.

As to the foregoing it would seem to be immaterial whether the mortgage securities were in the first instance obtained by loans made directly out of funds of the Blue Pass Book depositors or out of the general funds of the bank. By the terms of the agreement between Blue Pass Book holders and the Washington Bank and Trust Company the Blue Pass Book holders retained no interest in or claim upon the monies deposited, or paid, by them as partial or full payments upon the first lien 6% mortgage certificates. There was nothing in the agreement between the Washington Bank and Trust Company and the Blue Pass Book holders inconsistent with the expectation that the monies paid in to the Savings Certificate Department would be transferred to other departments of the bank or to the general fund of the bank. In fact the only method by which the Washington Bank and Trust Company, through its Savings Department, could fulfill its contract with the Blue Pass Book holders would be by exchanging the monies paid or deposited in the Savings Certificate Department for mortgage securities, or other securities of the same class, which would become the general investment res or fund. It would not seem to be material whether the mortgages were obtained for the Savings Certificate Department by a formal contract of purchase from the Washington Bank and Trust Company, or whether the monies paid into the Savings Certificate Department were transferred on the books of the Trust Company to the general funds, and mortgage securities of equal value transferred to the Savings Certificate Department to become a part of the investment res. Neither the interests of the general depositors, nor the financial integrity of the Washington Bank and Trust Company could be adversely af-

fected by a segregation of part of its assets consisting of mortgage securities, provided the general assets of the Washington Bank and Trust Company were augmented by an amount equal to the value of the mortgage securities thus segregated.

The trial court found, among other facts, (1) that by the agreement between the parties the bank reserved the right to deduct counterclaims; and (2) that the Blue Pass Book holders were permitted to withdraw funds; and (3) that the Washington Bank and Trust Company agreed to pay interest upon the amounts credited to the Blue Pass Book holders. Appellant urges that the foregoing facts are inconsistent with the creation of a trust and force the conclusion, as a matter of law, that the Blue Pass Book holders were merely general depositors.

The counterclaim clause gave the company the "right to deduct from any credit the amount of such counterclaims as it may have against the original owner of this book." No particular type of counterclaim is designated, and the obvious purpose of the clause is to reserve to the company the right to deduct, as against an assignee of the original owner of the Blue Pass Book account, any counterclaims which the company could have asserted against the interest of the original owner. Since by the terms of the contract between the Washington Bank and Trust Company and the Blue Pass Book holders the Blue Pass Book holder had no interest in, and no claim against, the general assets of the Washington Bank and Trust Company, it would seem to be a reasonable construction of the language of the counterclaim clause to limit its application to claims arising out of the administration of the investment fund and in favor of the Washington Bank and Trust Company, as managing trustee of such fund. We are not warranted in reading into the language of the counterclaim clause

an intention to reserve to the Washington Bank and Trust Company in its general capacity all the rights of counterclaim which it could assert against its general depositors.

Although it was provided by the terms of the real estate savings certificates that any holder could *cash* the certificate by giving three months' written notice of such desire, other provisions qualified this privilege. How much cash he would receive depended upon the amount of available cash funds "actually paid to and collected by the Trust Company on account of the first liens secured by real estate mortgages," which constituted the investment fund; and the Blue Pass Book holders were not entitled, as a matter of right, to draw checks against their interest in the investment fund which was represented by the credit in the Blue Pass Book. But the trial court found as a fact that the Blue Pass Book holders "were permitted to and did issue checks to third parties against their said deposits in this Blue Book system and also withdrew such deposits without previous notice. And the court also found that the Blue Pass Book holders were permitted to withdraw funds by check payable to themselves or by receipt, "all of which were paid by the Trust Company without question from the deposits made by depositors holding these Blue Pass Books."

We understand from the facts found by the trial court that all withdrawals were charged against the Savings Certificate Department, but were in fact paid by the Trust Company out of the "common general fund" which included "all moneys received by the Trust Company either as commercial deposits, savings deposits, or deposits on Blue Pass Books." It may be that as a result of the practice of permitting more or less indiscriminate withdrawals by the Blue Pass Book holders and charging the amounts of these withdrawals

to the Blue Pass Book system, which, as among the Blue Pass Book depositors, amounted to an advancement to the withdrawing holder as against his interest in the common investment fund, the interests of Blue Pass Book holders in the investment fund suffered injury. But that would present a question of adjustment among the Blue Pass Book investors and the Washington Bank and Trust Company as trustee. Also it may be that the Washington Bank and Trust Company violated its duty to its general depositors by permitting the Blue Pass Book holders to withdraw amounts in excess of the amount of credit to which the Savings Certificate Department, acting for the Blue Pass Book holders, actually was entitled in the common fund of the Washington Bank and Trust Company. But the fact that the Washington Bank and Trust Company, as a trustee of the Blue Pass Book department's investment fund, has mismanaged the trust, or the fact that in its general banking capacity it has misused the general deposits, even to the advantage of the Blue Pass Book investment trust, would not destroy the trust agreement and convert the beneficiaries of the trust arrangement into general depositors of the bank.

The provision of the agreement between the Washington Bank and Trust Company and the Blue Pass Book holders on the subject of interest does not tend to show the existence of a general depositor or creditor relationship, since by the terms of the investment agreement no interest is payable unless it is produced by the profitable management of the investment fund. There is no general obligation of the Washington Bank and Trust Company, either as trustee or in its general banking capacity, to pay interest on the sums credited to holders of Blue Pass Books.

Disregarding for the moment any question of the legal power of the Washington Bank and Trust Com-

pany to create the investment trust, we conclude that on account of the agreement entered into between the so-called Blue Pass Book holders and the Washington Bank and Trust Company, through its Savings Certificate Department, a trust relation arose and a trust res or investment fund was created consisting, in the first instance, of deposits, or payments, of the Blue Pass Book holders; and that this fund was transferred to, and became a part of the general fund of the Washington Bank and Trust Company in exchange for mortgage certificates, which in turn became the investment fund which was held in trust for the Blue Pass Book holders by the Washington Bank and Trust Company through its Savings Certificate Department.

Appellant's proposition which is pertinent to the question of the power of the Washington Bank and Trust Company to engage in the transactions involved in this appeal, is in substance as follows: A contract by a bank or trust company, whereby the assets of the bank and trust company are pledged to secure payment of a private deposit, is void against public policy, except in instances where there is an express legislative grant of power to make such a contract. Appellant's proposition and arguments in support thereof derive whatever force they have from the assumption that the relation between the Washington Bank and Trust Company and the holders of Blue Pass Books is that of bank and ordinary depositor, accompanied by an agreement by the bank to pledge a part of its general assets to secure the deposits involved in the relationship. The recent decision of this court in the case of *Sindlinger* v. *Department of Financial Institutions* (1936), 210 Ind. 83, 199 N. E. 715, held that the method of handling savings investment accounts which was adopted by the Savings Investment Department of the Union Trust Company of

South Bend, Indiana, and which was substantially the same as that adopted by the Savings Certificate Department in the instant case, created the relationship of trustee and *cestui que* trust; and further held that the Union Trust Company had the power to establish its "Savings Investment Department" and to transact the business of this department in the manner provided for under its agreement with those who became depositors in this department. The Union Trust Company of the Sindlinger case and the Washington Bank and Trust Company of the instant case were organized under the same statutory provisions.*

It is beyond question that the Washington Bank and Trust Company had the power to make loans upon the security of real estate mortgages; and it is equally clear that it could have converted these mortgage securities into cash by assignment or conveyance to investors. Furthermore, the Washington Bank and Trust Company had the power to take back by assignment all such mortgage securities under an agreement to hold them in trust as an investment fund. Consequently, it would seem that the Trust Company had the power to segregate from its general assets a part, or all, of its mortgage securities and sell first lien mortgage certificates to investors with an agreement that the mortgage securities would be held as an investment fund for the benefit of the holders of the first lien mortgage certificates. By this transaction the Washington Bank and Trust Company converted its mortgage securities into cash by selling all beneficial interest in the mortgage securities, although it retained the legal title to the mortgage securities. The security of the general depositors of the Washington Bank and Trust Company could not have been lessened by the transaction since the general assets were not diminished thereby, and the general financial

*Acts 1893, ch. 161, §10, as amended by Acts 1921, ch. 20, §3.

soundness of the Bank and Trust Company could not have been impaired.

We conclude that the Washington Bank and Trust Company possessed the legal power to create a trust for the benefit of the Blue Pass Book holders by the method, which the facts, as found by the trial court, disclose were used in the instant case.

In accordance with our views as expressed in the foregoing discussion we hold that the Marion Circuit Court did not err in stating its conclusions of law and in overruling the motion for a new trial.

The judgment of the Marion Circuit Court is affirmed.