## HACK v. AMERICAN SURETY CO. OF · NEW YORK.
### No. 6260.

Circuit Court of Appeals, Seventh Circuit.

April 26, 1938.

Rehearing Denied June 1, 1938.

940

Burke G. Slaymaker and Hugh E. Reynolds, both of Indianapolis, Ind. (Slaymaker, Merrell & Locke, of Indianapolis, Ind., of counsel), for appellant.

Miller, Miller & Bredell, of Indianapolis, Ind. (Samuel D. Miller, Sidney S. Miller, and Harold H. Bredell, all of Indianapolis, Ind., of counsel), for appellee.

White, Wright & Boleman, of Indianapolis, Ind., amicus curiæ for New Amsterdam Casualty Co.

Kane, Blain & Hollowell, of Indianapolis, Ind., amicus curiæ for Fidelity & Deposit Co. of Maryland.

A. J. Rucker, Frank Symmes, and Fae Patrick, all of Indianapolis, Ind., amicus curiæ for Asa G. Smith, receiver.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

EVANS, Circuit Judge.

Judgment was entered in the District Court for $120,917.94, upon two "Bankers' Blanket Bonds" issued by defendant surety company to cover losses through fraud and misfeasance perpetrated by the bank's officers.

The defendant surety company, in October, 1922, issued two bonds to the bank, each for the face amount of $25,000, one primary, and one to cover excess loss. They were thereafter renewed annually, and expired in October, 1926. The bank, of which plaintiff was appointed successor receiver on March 1, 1933, closed in October, 1930. The losses arose by reason of various fraudulent and irregular practices of the bank's president and secretary. This action on the bonds was begun, June

12, 1933, in the Indiana Circuit Court and removed to the Federal court. A jury trial was waived, and the court, because of the complexity of the issues, on its own motion referred the cause to a common law auditor, who, after hearing the evidence, made findings in favor of the plaintiff. The District Court also made special findings of fact and conclusions of law, upon which it predicated its judgment. The judgment was determined on the theory that the liability under the bonds was cumulative, that is, a new liability arose, for each successive year. It may be itemized as follows:

| | Primary Bond | Excess Bond | |
|---|---|---|---|
| 1922–23 | ..... | ——— | |
| 1923–24 | .....$24,480 | ——— | |
| 1924–25 | ..... 25,000 | $25,000 | |
| 1925–26 | ..... 25,000 | ——— | |
| | | | $ 99,480 |
| | | 6% interest | 21,437.94 |
| | | | $120,917.94 |

An Indiana statute, section 3948, Burns' Ann.St.1926, requires bank officers to be bonded, and it is over the interpretation of this section and especially its proviso, that the sharply-controverted issue on this appeal arises. The section reads:

"No president, vice-president, treasurer, or secretary, or other active officer of such company, shall enter upon the discharge of his duties until he shall have executed a bond to the company, conditioned for the honest and faithful discharge of his duties, in such sum and with such surety or sureties as may be approved by the board of directors, nor until such bond, so approved, has been filed in the office of and approved by the bank commissioner of the State of Indiana; *Provided, however, such individual bond shall not be required of any such officer if a blanket bond covering all the active officers and employees of such company, in an amount and with a surety or sureties approved by the board of directors, shall have been filed in the office of and approved by said bank commissioner * * *.*"

The bond is set forth in the margin.[1]

The Facts: This controversy primarily concerns legal issues, and it is unnecessary to describe in detail the many intricate fraudulent manipulations of the bank's of-

---

[1] Bankers' Blanket Bond Standard Form No. 1.

"In consideration of the premium of * * * $1670.00 * * * for a period of one year from the date hereof, and of subsequent annual premiums, * * * the Underwriter * * * agrees to indemnify the Insured * * * (for) * * * any loss, to an amount not exceeding * * * $25,000 * * * of money, * * * promissory notes * * * or other similar securities * * * in which the Insured has a pecuniary interest or for which it is legally liable, sustained by the Insured while this bond is in force and discovered by the Insured subsequent to noon of the date hereof and prior to the expiration of twelve months after the termination of this bond * * *:

"(A) Through any dishonest act of any of the Employees, whether committed directly or by collusion with others * * *.

"2. This bond does not cover—(c) Any loss resulting directly or indirectly from any act or acts of any director of the Insured * * * (d) Any loss the result of any loan made by the Insured or by any of the Employees, whether authorized or unauthorized, unless such loan be made with intent on the part of such Employees to defraud the Insured.

"4. The Insured shall give to the Underwriter written notice of any loss hereunder as soon as possible after the Insured shall learn of such loss, and within ninety days after learning of such loss shall file with the Underwriter an itemized proof of claim duly sworn to * * *.

"6. No action * * * shall be brought under this bond in regard to any loss, unless begun within twelve months after the Insured shall learn of such loss, or, in case such limitation be void under the law of the place governing the construction hereof, then within the shortest period of limitation permitted by such law. * * *

" * * * In no event shall the Underwriter be liable on account of any one loss or series of losses caused by the acts or omissions of any Employee * * * for a greater amount than that specified in line 11 hereof * * *.

"This bond shall terminate—(a) thirty days after the receipt by the Insured of a written notice from the Underwriter * * * or (b) upon the receipt by the Underwriter of a written request from the insured to terminate * * *. This bond shall terminate as to any Employee (a) as soon as the Insured shall learn of any default hereunder committed by such Employee, or (b) fifteen days after the receipt by the Insured of a written notice from the Underwriter of its desire to terminate this bond as to such Employee." (Modifications and Riders have not been set forth)

ficers, J. Edward Morris and Mark Rinehart, which resulted in the losses for which plaintiff seeks to hold defendant. An understanding of the situation may be had if we first chronologically state the more important facts:

Bank organized ................March 8, 1912.
J. Edward Morris, President
 and director from ............1918–1930
Bonds Nos. 799398-A and '9-A
 executed October 26, 1922 and
 renewed in 1923, 1924, and 1925,
 expiring ......................October, 1926.
Mark V. Rinehart, secretary
 and director ..................1922–1930.
Special and regular dividends
 of $24,000 paid out from ......December 24, 1923 to
 July 1, 1926.
Morris took $70,000 through
 mortgages .....................1924–1925.
Check for $5,000, of which Morris took proceeds .............1925.
Bonds terminated ..............October 26, 1926.
Bank closed by Bank Commissioner .........................October 27, 1930.
J. Edward Morris died ........March 27, 1931.
Hack, plaintiff, appointed receiver .........................March 1, 1933.
This action filed in state court..June 12, 1933.
Judgment for $120,917.94 ......Jan. 15, 1937.

The facts, though not unusual, are not pleasing. Two unprincipled men so beguiled the bank's directors into the belief that they were the embodiment of integrity, that the directors neglected for over a decade to independently investigate the bank's affairs, but implicitly relied on these officials' statements and approved all their recommendations. The unscrupulous officers were thereby enabled through the subterfuge of controlled corporations to filch a very large amount of the bank's assets. Morris was president of five such companies, and Rinehart controlled two others, as well as being a participant in Morris' companies.

This case has been thoroughly briefed by both sides, and outsiders have filed briefs as amici curiæ. Defendant has raised many interesting questions. The importance of the legal issues here propounded is such that they deserve specific enumeration.

(1) Were defendant's "blanket bonds" "statutory bonds"? Are they "official" bonds subject to rules of construction applicable to such bonds?

(2) If "statutory" bonds, does the fact that they are in the Indiana statute specifically covered in the *proviso*, free them from conditions heretofore held by the Indiana Supreme Court to inhere in statutory bonds; namely, inhibition against imposing periods of limitation of liability, etc.?

(3) What period of limitation is applicable? (a) The one year limitation provided for by the policy? (b) The three year limitation of statute applicable to foreign corporations? (c) The five year limitation on public officers' bonds? (d) The ten year limitation provided by Indiana statute for suits on contract?

(4) When does the period of limitation begin to run? From the date of the fraudulent act, the date of discovery or when the misdeeds should have been discovered, or the date when the defrauding officer terminated his office?

(5) Is a fidelity surety released from liability because of insured's execution of covenants not to sue, with bank's directors?

(6) Did surety have right of subrogation, and if so was it released from liability if such right of subrogation were lost by plaintiff's covenants not to sue?

(7) How is amount of the loss, if any, to be determined? Shall entire amount of subject matter of fraudulent transactions be recovered? At what date should loss be measured, and should solvency of third party be considered?

(8) Are the bonds to be treated as annually cumulative in coverage or only for $25,000 per policy no matter how many years they were in force?

(9) Does interest run from date of misappropriation? from date of demand? of institution of suit? or from date of judgment?

The importance of holding the bonds statutory and official bonds is apparent. If statutory and official bonds, we must exclude those express provisions, unconsonant with the statute and include the statutory provisions which have been omitted by the parties.

◼ We conclude that the bonds here involved are *statutory* and *official bonds*. We so conclude for the following reasons:

◼ (a) The Supreme Court of the State of Indiana in the case of United States Fidelity & Guaranty Co. v. Poetker, 180 Ind. 255, 102 N.E. 372, L.R.A.1917B, 984, so construed the bond of a bank cashier. The Indiana statute is involved, and the construction of the Indiana statute by the Indiana Supreme Court is of controlling weight with us. McGuire v. Sherwin-Williams Co., 7 Cir., 87 F.2d 112; Andris v.

Du Pont Cellophane Co., 7 Cir., 93 F.2d 421. See, also, Boseman v. Conn. Gen. Life Ins. Co., 301 U.S. 196, 57 S.Ct. 686, 81 L.Ed. 1036, 110 A.L.R. 732.

(b) The statute required a bond to be given and these were the only bonds procured. The statute provided for approval by the board of directors and filing with the State Bank Commissioner. These bonds were approved and were filed (at least the renewals) with the Bank Commissioner. The statute required the bond to cover "honest and faithful" discharge of duties; the bonds covered "dishonest" acts. These facts indicate an intention to take a course pursuant to that prescribed by the statute.

United States Fidelity & Guaranty Co. v. Poetker, 1913, 180 Ind. 255, 102 N.E. 372, 373, L.R.A.1917B, 984, involved a suit by a bank receiver upon a surety bond for breaches of the bond committed by the bank's cashier. Judgment was rendered for the full penalty of the bond ($25,000), with interest (from date of demand). This was not a *blanket* bond. The bond provided for notice of discovery of acts upon which loss was claimed within a certain period of time, and provided that no suit be brought after twelve months from the date of discovery of the loss. The bond had numerous other provisions which qualified and avoided liability. This bond was approved by the directors and filed with the state. It was renewed three times.

We quote at length from this important opinion:

"In behalf of appellee it is claimed that the bond must be held to be a statutory official bond legally of a character and with such conditions only as the statute provides. * * *

"It has been held by this court that 'The quasi-public nature of the banking business, and the intimate relation which it bears to the fiscal affairs of the people and the revenues of the state, clearly bring it within the domain of the internal police power and make it a proper subject for legislative control.' * * *

"In the exercise of this governmental power the General Assembly has enacted the following provision affecting banks organized under the laws of the State. * * *

"Such a plain and simple obligation with the broad and comprehensive condition the statute requires, and one less direct and less burdensome for the surety does not satisfy it. A bond such as the one given in this instance, which is manifestly prepared with studied care to avoid all liability on the part of the surety, * * * certainly does not fulfill the requirements of the statute. * * *

"The statute fixes upon surety companies the character of lawful sureties upon statutory bonds, but it gives them no authority to change the character or legal effect of the bonds which the statute exacts. * * * It is, of course, to be conceded that a surety company may, in dealing with a private citizen, with a free hand unhampered by statutory restrictions, make such a contract of suretyship as it chooses and guard and limit its liability by as many provisions as it pleases and * * * the surety is bound only according to the terms of the bond. But even in such a case the rule of *strictissimi juris,* which has been invoked for the benefit of private individual sureties who sign for accommodation and not for compensation, and which requires a strict construction of the contract in their favor, and a resolution of all doubts in their favor does not apply to the involved contract of a surety company which becomes surety for profit. In the latter case the rule is reversed, and the contract, when there is room for construction, is to be construed most strongly against the surety and in favor of the indemnity which the obligee had reasonable ground to expect. [Citing cases.]

"No other bond was taken in this case than the one in suit, and it is not denied that it was taken by the directors and given by Behrens and appellant in compliance with the statute, and pursuant to the statute it was filed in the office of the Secretary of State. It has long been the rule in this state that, when a bond is given in obedience to a command of the statute, a construction shall be given it which binds the obligors to the performance of the conditions which the statute declares it shall contain, even though the bond does not specifically so provide. The rule has been applied to personal sureties * * *. The reason for its application to corporations or others who engage in the business of becoming sureties or guarantors for profit, and who offer themselves as common sureties or guarantors for hire, is greater.

"That it is the settled policy of the state to fix the conditions of bonds required

by statute and to hold sureties thereon to the performance of the conditions named clearly appears from statutory provisions. * * *

"It has been frequently decided in this state that bonds taken pursuant to a requirement of a public statute are official bonds within the meaning of this section of the statute. * * *

"It has also been held that the provisions of the statute requiring the bond enter into and become a part of the bond, whether written in it or not, and constitute the contract upon which both the rights and the liabilities of the surety are to be determined. * * * 'The wording of the bond neither adds to nor takes from the recognizor any liability created by statute. Where a bond contains more or less than is required by statute, it operates and has the force and effect of the statute authorizing it. If the bond contains less than required by statute, the bondsman will be held to what it should have contained; and, if it contains more than required by statute, the measure of liability would be to the extent defined by statute.' * * *

"If the law has made the instrument necessary, the parties are deemed to have had the law in contemplation when the contract was executed. * * *

"It fairly follows from what has been said that the bond in suit must be held to be an official bond within the meaning of section 1278. * * *

"As it appears that a just result was reached in the trial court, the judgment is affirmed."

While the opinion in the Poetker Case leaves various questions undecided, or at least debatably determined, and both sides cite it as authority for their opposing contentions, and the Indiana statute is not a model of clear expression of legislative enactment and intent, we are convinced that they should be construed so as to hold the bond therein referred to (and the bond before us) as statutory official bonds,[2] and as such, the statute, rather than the restricted written contract of the parties, measures the liability of the surety. Regardless of its language it covered dishonest and unfaithful discharge of officers' duties. This also applies to the efforts of

the said surety to restrict its said liability by fixing a time limit within which an action must be instituted. The Indiana statute of limitations, not the shorter period specified in the contract, must govern the time within which action shall be brought or barred.

The argument that the section should be construed so as to apply differently to blanket bonds from its application to officers' individual bonds, may be disposed of very briefly. Why should there be restrictions placed on blanket bonds not imposed on officers' bonds? The purpose is the same. The references to blanket bonds and officers' bonds appear in the same section. The Act was evidently enacted to protect depositors. The legislature was authorized to act because the public had an interest in the banks and their handling of deposits. The legislation is an illustration of the ever-present conflict between the public, acting through state or Federal legislation, and industry. Banks resent regulation. They decry its hampering influence. When banks fail and it is found that deposits have melted away in bank officials' speculative actions, the cry goes up loud and angrily for stricter regulations. Legislation often follows,—sometimes of the kind here involved.

We are not concerned now with its wisdom, but with its construction and application. We cannot, however, ignore the obvious intent of those who were seeking to more adequately secure depositors against loss through dishonest conduct of officers and employees. We find no possible justification for placing a different purpose, intention or construction on the proviso permitting blanket bonds from the provisions governing officers' individual bonds.

This conclusion, however, does not specifically answer the two vital questions: When did the statute begin to run? Was it the three-year or the ten-year statute that applied?

We accept for the purpose of this case the view that the three-year statute, applied. There are reasons which support this position and we must admit there are arguments for adopting the ten-year period. As we find the action was brought within three years, we see no reason why we

---

[2] See also, London & Lancashire Indemnity Co. v. Community Savings & Loan Ass'n, 102 Ind.App. 665, 4 N.E.2d 688; Southern Surety Co. v. Kinney, 74 Ind.App. 205, 127 N.E. 575; Nat. Surety Co. v. State, 90 Ind.App. 205, 161 N.E. 573; Nat. Surety Co. v. State ex rel. Rathburn, 90 Ind.App. 524, 161 N.E. 832.

should endeavor to determine the question which the Supreme Court of Indiana undoubtedly will be called upon to determine ultimately and its decision will be accepted by courts and parties. Likewise, there is, of course, the possibility of the Indiana legislature in the meantime clarifying the law through more specific legislation.

We hold, also, that the action was begun within the three year period.

The action was instituted June 12, 1933. Plaintiff did not learn of the officers' default until March 1, 1933, the date of his appointment. We are not required to absolutely fix the exact date, but do hold that a date earlier than October 27, 1930 (the closing of the bank) could not be established as the date the fraud of the officers could have been discovered.

This brings us to the most difficult question in the case, namely, the amount of the liability. Should the bond be treated as cumulative? Or should each bond be limited to the sum of $25,000?

The District Court accepted the theory of the plaintiff and allowed a total recovery of $120,917.

The maximum recovery under the defendant's theory would be $50,000 and interest.

We reach our conclusion hesitatingly and confess our inability to rid ourselves of a serious doubt. The failure of the insurance company to so unquestionably and specifically limit its liability as to remove all doubt supplies a strong urge on our part to hold it liable for the larger sum. Surely, it could have removed all doubt by the addition of a few more words, and there are numerous cases, including decisions from our own court,[3] which have held insurance companies under such circumstances to a construction of their contract unfavorable to themselves.

The decision of Aetna Casualty & Surety Company v. Commercial State Bank, D.C., 13 F.2d 474 (reversed on other grounds, 7 Cir., 19 F.2d 969), holding the liability on a somewhat similar bond to be cumulative, would undoubtedly be accepted by us but for the fact that there is in the present contract some language which distinguishes that case. As pointed out in the last-cited case, it would seem unreasonable for parties to contract and pay annual premiums when in fact the maximum liability was exhausted the first year. We refrain from citing cases for they have been well collected in the Aetna Casualty Case, supra, and 27 Michigan Law Review, page 442; Couch, Cyclopedia of Insurance, § 1374; and Standard Accident Ins. Co. v. Collingdale State Bank, 3 Cir., 85 F.2d 375.

We, however, have been unable to hurdle or circle a clause of the contract in the instant case which provides that, "in no event shall the *aggregate liability* of the Surety for *any one or more defaults* of the principal during any *one* or *more years* of the suretyship under the bond hereinabove referred to, as extended by this or any other extension thereof, exceed the amount specifically set forth in said bond * * *." This language, it seems to us, indicates an intent by the parties to limit the surety's liability to $25,000 on each bond. What meaning are we to give to the word "aggregate"? Surely it cannot be ignored. See note 42 A.L.R. 834; Couch Cyclopedia of Insurance, § 1374; 27 Mich.Law Review 442.

The statute did not pretend to fix the amount of the required bond. The amount of the bond was left to the discretion of the directors.

It may well be argued and with much force that on this construction of the bond the surety company received, and the insured paid, substantial sums for renewals on the fourth year, when in truth and fact, there was no possible liability to be enforced during the said year because the maximum liability was reached in the third year. In refutation, it should be said that neither party knew that the officers had defaulted to the extent of $50,000 during the third year.

The situation is not unlike that of a life insurance policy where an erroneous age is given through mistake and an erroneous premium is charged and paid. Here we think the insurance company should

---

[3] American Surety Co. v. Pauly, 170 U.S. 133, 18 S.Ct. 552, 42 L.Ed. 977; Salley v. Globe Indemnity Co., 133 S.C. 342, 131 S.E. 616, 43 A.L.R. 977, and note; 62 A.L.R. 412; 77 A.L.R. 861; N. Y. Life Ins. Co. v. Kassly, 7 Cir., 87 F.2d 236; Hintz v. Hintz, 7 Cir., 78 F. 2d 432; Equitable Life Assur. Soc. v. Worthman, 7 Cir., 67 F.2d 721.

be compelled to return the premiums received for the last year for which the surety assumed no liability. We are not justified, however, where there was a mutual mistake, in increasing a maximum liability upon which the parties have specifically and expressly agreed. Doubtless this maximum liability bore on the amount of the premium.

It is unnecessary for us to go into the details of the various defaults of the officers. The evidence on these matters, although lengthy, fully justified the auditor's and the court's findings that the officers' conduct in numerous instances, involving losses that exceed $50,000 was not "honest and faithful." See extensive notes in 43 A.L.R. 977; 98 A.L.R. 1264. To express it thus is most conservative.

 Interest. We agree with the District Court as to the allowance of interest and the date from which it began to run. The surety undertook to answer for the default of its principals, the president and cashier of the bank. The measure of its liability is the liability of the bank's officers. The latter were liable to the bank for interest from the dates of their embezzlement. Erie Trust Co. Bank v. Employers' Liability Assur. Corp., 322 Pa. 132, 185 A. 224; Cooper v. Hill, 8 Cir., 94 F. 582. See also, Concordia Ins. Co. v. School Dist., 282 U.S. 545, 51 S.Ct. 275, 75 L.Ed. 528. Interest should therefore run on the first $25,000 from October, 1924, and on the second $25,000 from October, 1925. The rate is the statutory prescribed rate in Indiana, 6%. Interest at the same rate on the recoverable premium or premiums shall run from October, 1925.

Other questions are raised by appellant which we have duly considered but rejected as being without merit.

The judgment must be modified by substituting the sum of $50,000 and interest, as above stated, together with one year's premium and interest from October, 1925.

As thus modified the judgment should be affirmed. Each party shall pay half of the costs incurred in this court. To avoid any mistake in dates and amounts or in computations of interest the cause is remanded instead of being modified and affirmed, with instructions to enter a judgment in plaintiff's favor in accordance with the views here expressed.

## On Petition for Rehearing.

Defendant and plaintiff have both asked us to reconsider questions decided by us in our recently announced opinion. Since that decision was announced, the Supreme Court has decided Erie Railroad Co. v. Tompkins, 58 S.Ct. 817, 82 L.Ed. ——, 114 A.L.R. 1487, Ruhlin v. New York Life Insurance Co., 58 S.Ct. 860, 82 L.Ed. ——, and New York Life Insurance Co. v. Jackson, 58 S.Ct. 871, 82 L.Ed. ——, and the opinion in Swift v. Tyson, 16 Pet. 1, 10 L. Ed. 865, at long last, for better or for worse, has become merely "words without meaning" "fit for space but not for place."

We gather from these opinions that it is our duty to show affirmatively that our decision rests upon the law of the State of Indiana where this cause of action arose, rather than upon the general law governing the subject of insurance. With the purpose of ascertaining more certainly the Indiana law, we have reconsidered the various questions raised and conclude that there is no variance between the law of Indiana and the law applied by us in this case.

In the case of Erie Railroad Co. v. Tompkins, the Court said (page 822):

"Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern."

We assume that if the Supreme Court of the state has not spoken and there are decisions by an appellate court, we should, in the absence of conflict, follow the law of that, or those, decisions.

This being so we are justified in briefly calling attention to the Indiana decisions which support the conclusions expressed by us on the various points involved on this appeal.

In Hack, Receiver, v. Bolint, 101 Ind. App. 133, 191 N.E. 177, the court held that the appellee is authorized to represent all parties interested in the settlement of the affairs of the bank. In Hack, Receiver, v. Christina, Ind.Sup., 11 N.E.2d 152, and Hack, Receiver, v. Jobes, Ind.Sup., 11 N.E.2d 161, 164, the appellee herein was one of the parties and the court held that the mortgage certificate accounts were val-

id trusts and that the certificate holders were trust beneficiaries and had a prior lien upon the allocated securities.

Indiana courts have allowed interest in actions on bonds of the character here involved. Southern Surety Co. v. Kinney, 74 Ind.App. 205, 127 N.E. 575; U. S. F. & G. Co. v. Poetker, 180 Ind. 255, 102 N. E. 372, L.R.A.1917B, 984. We have not found an Indiana case which specifically determined the date from which interest begins to run. In the absence of an Indiana decision on the subject, we adhere to the conclusion expressed in the original opinion, supported as it is by the decisions therein cited.

Indiana decisions support the appellee's contention that the covenant not to sue the directors did not relieve the defendant from its liability on the bond. Washington Township Board v. American Surety Co., 97 Ind.App. 45, 183 N.E. 492; Parry Mfg. Co. v. Crull, 56 Ind.App. 77, 101 N.E. 756; Pike County Coal Co. v. Farrabee, 79 Ind. App. 210, 137 N.E. 680.

In General Asbestos & Supply Co. v. Aetna Casualty & Surety Co., 101 Ind.App. 207, 198 N.E. 813, the court denied the contention that approval of a bond by the Bank Commissioner constituted an approval of the terms of the bond which conflict with the provisions of the statute.

As to the right to recover the premium paid upon the mutually entertained false assumption that there was a liability under the bond when the premiums were paid, we have found no Indiana case which either supports or refutes the conclusion reached in the original opinion. The argument on rehearing, however, convinces us that the defendant is in an embarrassingly inconsistent position when it argues that the full liability on its bond was reached when a default of $25,000 was shown and yet, nevertheless, it thereafter collected and retained premiums thereon. If there existed no liability then the premiums should be returned. If there was a consideration for the payment of the premium then the liability must have been $25,000 each year. Defendant can not consistently (or wisely) take two diametrically opposite positions in the same case before the same court.

We assume that the payment was made and received on the mutual assumption of the parties that no default had occurred up to the time of the latter premium payments.

The contention of the defendant that there was no cause of action stated in the pleading for this sum, is readily disposed of on the theory that the pleadings will be presumed to be amended to conform to the proof. When the proof disclosed that the liability of the defendant was limited to $25,000 and the default exceeded that amount and notwithstanding these facts the plaintiff paid and the defendant received premiums, a situation was disclosed which necessitated the repayment of said premiums to the plaintiff. If we were to dispose of this case strictly on the pleadings, we might with propriety hold that the defendant should not be permitted to deny its liability for $25,000 each year without offering to return the premium it had received for the years when no liability existed.

It seems to us, however, that the proper disposition of the case calls for the assumption by the court that all parties acted in good faith and the premiums were paid in the mistaken belief that a liability existed and that not until the proof was all before the court did the parties know of the extent of the liability or of the default.

As to the plaintiff's urge that our disposition of the case is erroneous in that we limited the liability to $25,000 on each bond, we are not convinced that an erroneous conclusion was reached. We have not found an Indiana case which construed language such as appears in the contract before us. There exists some support for our conclusion in U. S. F. & G. Co. v. Poetker, 180 Ind. 255, 102 N.E. 372, L.R.A. 1917B, 984. The decision is not controlling, however, because of the absence of discussion and the difference in the language of the two contracts.

As stated in the original opinion the question is not entirely free from doubt, but the language in the renewal contract was, and still is, accepted by us as controlling and limited the total amount of the insurance company's liability to $25,000 on each bond.

In passing it might be observed that plaintiff, in his brief in support of his request for a modification of our opinion, was not justified in attributing to the court the making of admissions. Admissions are statements made by parties against their interest. The court does not speak as the representative of a party and a statement by counsel that the court made admissions is incorrect and carries imputations which

we naturally resent. A reading of the opinion will show that the court attempted to state facts and arguments which supported the plaintiff's position. They might well have been controlling and were persuasive, at least, but for the use of the words "in no event shall the aggregate liability of the Surety for any one or more defaults of the principal during any one or more years of the suretyship under the bond hereinabove referred to, as extended * * * exceed the amount specifically set forth in said bond." These words, it seemed to us, outweighed facts and arguments pointing to a contrary conclusion and caused us to hold the maximum of liability under each bond was $25,000.

The petition for rehearing and the motion for modification are both

Denied.